# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | |
| ABRAHAM DELEON MEDINA | : | NO. 15-554 |

## MEMORANDUM OPINION

**Savage, J.**                                                                                                       **April 22, 2021**

Moving for a reduction of sentence under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), Abraham DeLeon Medina, a prisoner at USP Lewisburg, contends that his serious health condition and the COVID-19 pandemic constitute extraordinary and compelling reasons warranting a reduction of his sentence. Medina claims that he is not a danger to the community, and that he suffers from obesity, which places him at greater risk of severe illness or death from COVID-19. The government argues that Medina's health condition is appropriately managed in prison, and he presents a danger to the community, citing the nature of his drug and firearm offenses.

On December 21, 2015, Medina pled guilty to one count of conspiracy to distribute heroin and methamphetamine, two counts of possession of heroin and methamphetamine, and one count of possession of a firearm in furtherance of a drug trafficking offense. On January 10, 2018, Medina was sentenced to 95 months' imprisonment followed by ten years of supervised release. He has been in custody since September 17, 2015. He is scheduled to be released on June 16, 2022. He had no prior criminal history, and he has had no disciplinary infractions while in prison. Medina is 30 years old and suffers from obesity.

1

After considering all the factors set forth in 18 U.S.C. § 3553(a) and the circumstances of Medina's compromised health, the COVID-19 pandemic, the risk of contracting COVID-19 at his facility and the close proximity of his release date, we conclude that Medina has presented an extraordinary and compelling reason warranting a sentence reduction. We also find that he is not a danger to the community. Therefore, we shall grant his motion and reduce his sentence.

## Compassionate Release

### *The Historical Statutory Framework*

A court may reduce a defendant's sentence, after considering the factors set forth in 18 U.S.C. § 3553(a), if it first finds that extraordinary and compelling reasons warrant a reduction and "a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Before ordering the release of a prisoner, the court must determine that he is not a danger to the safety of others or the community. 18 U.S.C. § 3142(g).

Congress did not define what constitutes an extraordinary and compelling reason, leaving it to the Sentencing Commission to do so. In its policy statement and commentary addressing Section 3582(c)(1)(A), the Sentencing Commission set forth three specific extraordinary and compelling reasons. U.S.S.G. § 1B1.13, cmt. n. 1. Application Notes 1(A) through 1(C) detail qualifying medical, age and family circumstances.

Making it clear that these were not the only reasons that may be considered extraordinary and compelling, the Sentencing Commission added an "other reasons" category that provides a reduction may be warranted by an "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A)

2

through (C)." U.S.S.G. § 1B1.13, cmt. n. 1(D). At the same time, it delegated the Bureau of Prisons ("BOP") Director to define what "other reasons" qualify under subdivision 1(D). *Id*.

In exercising its delegated authority, the BOP issued Program Statement 5050.49 setting forth its criteria for compassionate release.[1] The Program Statement included criteria for granting requests based on medical, age and family circumstances. It also listed factors to be considered for all requests.[2] After passage of the First Step Act (FSA), the BOP amended the Program Statement outlining the circumstances that it deemed may justify relief.[3] However, those circumstances were limited to the same bases identified by the Sentencing Commission – medical, age and family circumstances. Significantly, despite having been given the authority to do so, the BOP has not identified what other reasons may support compassionate release.

Until Congress amended the compassionate release statute in the FSA, the BOP had the exclusive authority to move for a sentence reduction.[4] With that authority came

---

[1] U.S. Department of Justice, Federal Bureau of Prisons, Program Statement 5050.49 (Aug. 12, 2013), available at https://www.bop.gov/policy/progstat/5050_049_CN-1.pdf.

[2] *Id*. at 3-10. Similar to the Section 3553(a) factors, these factors include the nature and circumstances of the offense, the defendant's criminal history, comments from victims, unresolved detainers, supervised release violations, institutional adjustments, disciplinary infractions, the defendant's personal history derived from the Pre-Sentence Report, the length of the defendant's sentence and the amount of time served, the defendant's current age, the defendant's age at the time of the offense and sentencing, any release plans and whether release minimizes the severity of the offense. *Id*. at 10.

[3] U.S. Department of Justice, Federal Bureau of Prisons, Program Statement 5050.50 (Jan. 17, 2019), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. These changes include requiring inmates be informed of the availability and process for sentence reductions, modifications to the definition of "terminally ill," requiring notice and assistance for terminally ill inmates, requiring requests for terminally ill inmates be processed within 14 days, requiring notice and assistance for debilitated offenders and specifying that inmates may file motions directly in court after exhausting administrative remedies or 30 days from the receipt of the request by the warden. *Id*. at 3.

[4] "How the First Step Act Changed Federal Compassionate Release," Compassionate Release: A Project by Brandon Sample, Attorney at Law (2020), https://compassionaterelease.com/first-step-act-compassionate-release/.

the sole responsibility for determining what reasons other than medical condition, age, and family circumstances qualified as extraordinary and compelling. If the BOP did not consider a defendant's reason extraordinary and compelling and did not file a motion, the defendant had no recourse to the courts.[5] Consequently, there was no way to discern what circumstances, if any, constituted an extraordinary and compelling reason other than the enumerated ones.

The process changed when Congress passed the FSA in December 2018. Congress displaced the BOP as the exclusive gatekeeper of motions for sentence reductions. Now, a defendant, after exhausting administrative remedies, may move for a reduction under 18 U.S.C. § 3582(c)(1)(A).

Congress changed the process in reaction to the BOP's inconsistent and infrequent use of the compassionate release mechanism. The BOP had filed few motions.[6] From 1984 to 2013, the BOP filed only approximately 24 motions annually.[7] From 2013 to 2017, of the 5,400 applications for compassionate release, the BOP approved only six percent.[8] During that period, 266 people who had requested compassionate release died while awaiting the BOP's determination to file motions on their behalf.[9] The Inspector General's report finding that the BOP rarely moved for

---

[5] *Id*.

[6] *United States v. Redd*, 444 F. Supp. 3d 717, 725 (E.D. Va. 2020) ("The First Step Act was passed against the backdrop of documented infrequency with which the [BOP] filed motions for a sentence reduction on behalf of defendants.").

[7] *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice)).

[8] "How the First Step Act Changed Federal Compassionate Release," *supra* note 4.

[9] *Id*.

compassionate release under its own policies led the Sentencing Commission to amend its policy to encourage the BOP to use the mechanism more frequently. *See* "§ 1B1.13 (Policy Statement) – Compassionate Release," U.S. Sentencing Commission (2016), https://www.ussc.gov/sites/default/files/elearning/2016-guideline-amendments/story_content/external_files/Comp%20Release.pdf (announcing the broadening of eligibility criteria for compassionate release to expand the pool of candidates).

To exhaust administrative remedies, a defendant must first present his request for compassionate release to the warden. After 30 days of submitting the request, the defendant may move for compassionate release in the district court, whether the warden has denied the request or has not acted. *Id.*; *United States v. Raia*, 954 F.3d 594, 595-96 (3d Cir. 2020).

Medina has exhausted administrative remedies. He filed a written request with the warden on October 27, 2020.[10] More than 30 days have passed since the warden received Medina's request. Therefore, we now consider the motion.[11]

The threshold issue is whether the COVID-19 pandemic is an extraordinary and compelling reason for reducing the defendant's sentence. Neither the Sentencing Commission nor the BOP has determined that it is. Indeed, as we previously noted, they have not identified any "other reasons" that qualify for a sentence reduction. Thus, the question is whether, absent such a determination, a court may decide what is an extraordinary and compelling reason for compassionate release.

---

[10] Def.'s Mot. to Red. Sent. at 2 (ECF No. 52).

[11] The government has also agreed to waive the exhaustion requirement in this case. Govt. Resp. in Opp. to Def.'s Mot. to Red. Sent. at 5-6 (ECF No. 49).

The Third Circuit has not ruled on this issue.[12] The Second, Fourth, Fifth, Sixth, Seventh, Ninth, and Tenth Circuits have, holding that district courts have discretion to determine what constitutes an "extraordinary and compelling" reason justifying compassionate release. *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 281 (4th Cir. 2020); *United States v. Shkambi*, No. 20-40543, 2021 WL 1291609, at *4 (5th Cir. Apr. 7, 2021); *United States v. Jones*, 980 F.3d 1098, 1108 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020); *United States v. Aruda*, No. 20-10245, 2021 WL 1307884, at *4 (9th Cir. Apr. 8, 2021); *United States v. McGee*, No. 20-5047, 2021 WL 1168980, at *12 (10th Cir. Mar. 29, 2021). They reason that until the Sentencing Commission updates the policy statements to reflect the FSA's changes, there is no applicable policy statement for prisoner-initiated motions for compassionate release. No circuit has held otherwise.

The Sentencing Commission, for lack of a quorum,[13] has not updated Sentencing Guideline Section 1B1.13, its commentary or application notes. The outdated guideline does not take into account that the BOP is no longer the gatekeeper to the courts and the sole determiner of what "other reasons" are extraordinary and compelling. The Sentencing Commission itself recognizes that its policy statement and commentary are outdated in light of the FSA's changes. *See* "Compassionate Release," *The First Step Act of 2018: One Year of Implementation*, U.S. Sentencing Commission, at 47 (August 2020), www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/

---

[12] This issue is pending appeal in the Third Circuit. *See United States v. Andrews*, No. 20-2768.

[13] The Sentencing Commission is currently unable to update Section 1B1.13 or its commentary because it lacks the necessary quorum. "ESP Insider Express Special Edition: First Step Act," U.S. Sentencing Commission, Office of Education & Sentencing Practice at 5 (February 2019), https://www.ussc.gov/sites/default/files/pdf/training/newsletters/2019-special_FIRST-STEP-Act.pdf.

2020/20200831_First-Step-Report.pdf. As the Commission acknowledges, "[t]he statutory changes made by the First Step Act did not make any changes to the Guidelines Manual, nor did the Act provide emergency amendment authority to the Commission. Thus, the policy statement at § 1B1.13 does not reflect the First Step Act's changes." *Id*.

It was not unreasonable for the Sentencing Commission to delegate the authority to the BOP to define what was an extraordinary and compelling reason because the BOP was the gatekeeper. The Commission had no need to issue a policy statement explicating other reasons for granting motions because courts had no real role in deciding what was a qualifying reason.

Now, the courts have the power to grant motions without the BOP's moving or approving them. To permit the BOP to define what reasons qualify for compassionate release would essentially give it a gatekeeping role, one that Congress took from it.

Given that the BOP is no longer the gatekeeper, it cannot set the policy for compassionate release. It makes no sense to have the BOP determine what is an extraordinary and compelling reason for reduction when it no longer exclusively controls the process. It cannot make the rules. The Sentencing Commission's policy statement is premised on a process that Congress has replaced. The Commission, for reasons not of its making, has not issued a new policy statement taking into account the change to the process entrusting the courts with the power to grant sentence reductions upon a defendant's motion without the BOP's input.

The statute provides that a reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). There is no longer any policy statement that applies because Congress changed the process,

significantly diminishing the role of the BOP in it. There is no reason for the Sentencing Commission, when it eventually has a quorum, to delegate authority to the BOP to decide what "other reasons" qualify as extraordinary and compelling.

Not to implement these changes now would frustrate the will of Congress, which intended that compassionate release be used more often and on a broader scope. *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194 (2018), entitled "Increasing the Use and Transparency of Compassionate Release."[14] Legislative history supports this conclusion. Senator Cardin explained: "[T]he bill expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. Rec. 192, at S7314, 2018 WL 6350790 (Dec. 5, 2018). *See also* 164 Cong. Rec. 201, at H10362 (Dec. 20, 2018) (statement of Rep. Nadler) ("The prison reform provisions of this bill also include a number of very positive changes, such as . . . improving application of compassionate release").

To continue relying on BOP criteria and allowing the BOP to delineate the grounds for a sentence reduction under Section 3582(c)(1)(A) would be inconsistent with the amended statute. It would allow the BOP to continue exercising a gatekeeping role by defining or limiting the grounds for compassionate release. Likewise, the Sentencing Commission's outdated guideline and commentary is inconsistent with the letter and the

---

[14] The title and preamble of an act can provide insight into its meaning. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* § 34, at 218 (2012) (Preambles "set forth the assumed facts and the purposes that the majority of the enacting legislature . . . had in mind, and these can shed light on the meaning of the operative provisions that follow"); *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Trainmen v. Baltimore & Ohio R. Co.,* 331 U.S. 519, 528–529 (1947)) ("We also note that 'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute."); *I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.").

spirit of the current compassionate release statute.[15] On the other hand, a court determining what constitutes a qualifying extraordinary and compelling reason is not inconsistent with any policy statement issued by the Sentencing Commission. There is no applicable policy statement to the contrary. Thus, we conclude that a court has the authority and responsibility to determine what is an extraordinary and compelling reason for a sentence reduction under Section 3582(c)(1)(A).

*COVID-19*

We now consider whether the COVID-19 pandemic and its impact on the prison population in a given case may warrant relief under Section 3582(c)(1)(A).

A generalized, non-specific threat of harm due to the COVID-19 pandemic alone is not a sufficient reason to grant compassionate release. As the Third Circuit stated, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*, 954 F.3d at 597. *See also United States v. Roeder*, 807 F. App'x 157, 161 (3d Cir. 2020) ("[T]he existence of a widespread health risk is not, without more, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid or substantially delay reporting for that sentence.").

To determine whether extraordinary and compelling reasons exist in an individual case, we consider the circumstances of the COVID-19 pandemic, the defendant's health conditions, the defendant's age, and the risk of contracting COVID-19 at the defendant's facility. None of these reasons alone is an extraordinary or compelling reason. Health complications without the risk of COVID-19 at a particular institution do not warrant

---

[15] The Guidelines Manual Commentary is authoritative unless it violates a federal statute or is inconsistent with the guideline. *United States v. Stinson*, 508 U.S. 36, 38 (1993).

9

release. Similarly, the fact that a facility may have confirmed cases of COVID-19 does not justify release if the defendant is not at risk due to age or other medical conditions. However, a combination of these circumstances may rise to the level of "extraordinary and compelling." Hence, each case must be determined by the facts unique to the defendant.

1. <u>Background on the COVID-19 pandemic</u>

The novel coronavirus, or SARS-CoV-2, is a virus that causes COVID-19, a serious respiratory disease that makes people severely ill, requiring hospitalization and in some cases leading to death.[16] COVID-19 is estimated to be ten times more lethal than the seasonal flu, with about 20% of infected patients requiring hospitalization.[17] As of April 22, 2021, COVID-19 has infected over 143 million people worldwide, resulting in over 3 million deaths.[18]

COVID-19 is highly infectious and spreads through respiratory droplets produced from talking, coughing or sneezing.[19] Many infected people are asymptomatic but may

---

[16] *See* "Q&A on coronaviruses (COVID-19)," World Health Organization (Apr. 17, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses.

Like COVID-19, Severe Acute Respiratory Syndrome (SARS), first identified in 2003, is caused by a coronavirus known as SARS-CoV. "COVID-19 vs. SARS: How Do They Differ?," Healthline (April 29, 2020), https://www.healthline.com/health/coronavirus-vs-sars. Middle East Respiratory Syndrome (MERS), first identified in 2012, is caused by a coronavirus known as MERS-CoV. *Id*. SARS and COVID-19 share many similarities, including their method of transmission, their symptoms, and the dangers they pose to certain at-risk groups. *Id*.

[17] Pien Huang, "How The Novel Coronavirus And The Flu Are Alike . . . And Different," NPR (Mar. 20, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flu-are-alike-and-different; "Similarities and Differences between Flu and COVID-19," Centers for Disease Control and Prevention (July 10, 2020), https://www.cdc.gov/flu/symptoms/flu-vs-covid19.htm.

[18] "WHO Coronavirus Disease (COVID-19) Dashboard," World Health Organization, https://covid19.who.int/ (updated daily).

[19] *Id*.

still transmit the virus.[20] In fact, experts believe that asymptomatic people may be one of the driving forces behind the spread of the outbreak.[21] The only way to slow the spread of COVID-19 is to conduct widespread testing, and enforce wearing face masks in public settings and other social distancing measures.[22]

The United States is the world leader in COVID-19 diagnoses, with over 31 million confirmed cases and more than 560,000 deaths.[23] The number of confirmed cases in the United States continues to rise.[24] The federal government and every state declared states of emergency, with more than half of the states and the District of Columbia imposing lockdown restrictions on their residents at different times and for varying periods of time.[25] The Third Circuit has recognized that the COVID-19 pandemic "has given rise to

---

[20] "Transmission of SARS-CoV-2: implications for infection prevention precautions," World Health Organization (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions; Nathan Furukawa, John Brooks and Jeremy Sobel, "Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic," 26.7 EID Journal (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article.

[21] Seyed Moghadas, Meagan Fitzpatrick, Pratha Sah, Abhishek Pandey, Affan Shoukat, Burton Singer and Alison Galvani, "The implications of silent transmission for the control of COVID-19 outbreaks," PNAS (July 6, 2020), https://www.pnas.org/content/early/2020/07/02/2008373117.

[22] "WHO Coronavirus Disease (COVID-19) Dashboard," World Health Organization, https://covid19.who.int/ (updated daily).

[23] Donald McNeil, Jr., "The U.S. Now Leads the World in Confirmed Coronavirus Cases," The New York Times (Mar. 26, 2020), https://www.nytimes.com/2020/03/26/health/usa-coronavirus-cases.html; "WHO Coronavirus Disease (COVID-19) Dashboard," *supra* note 22.

[24] Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, The Atlantic (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lostfebruary/608521/.

[25] *See* Rachel Treisman, "Which States Are Reopening? A State-By-State Guide," NPR (June 29, 2020), https://www.npr.org/2020/03/12/815200313/what-governors-are-doing-to-tackle-spreading-coronavirus; "Lockdowns, closures: How is each US state handling coronavirus?" Al Jazeera (Apr. 14, 2020), https://www.aljazeera.com/news/2020/03/emergencies-closures-states-handling-coronavirus-200317213356419.html.

11

exceptional and exigent circumstances that require the prompt attention of the courts." *Roeder*, 807 F. App'x at 161.

2. Medina's medical condition

The Centers for Disease Control and Prevention (CDC) have identified a number of health conditions and complications that place individuals at greater risk of severe illness, hospitalization and death from COVID-19. Among these risk factors is obesity.[26] Obesity is linked to impaired immune function and decreased lung capacity, and can triple the risk of hospitalization.[27] The risk is particularly pronounced in people under the age of 65.[28] Between March and November 2020, approximately 30% of COVID-19 related hospitalizations in the United States were attributed to obesity.[29]

According to the CDC, individuals are classified as "overweight" if their body mass index (BMI) score is greater than 25, "obese" if their BMI score is greater than or equal to 30, or "severely obese" if their BMI score is greater than or equal to 40.[30] The risk of severe illness or death from COVID-19 "increases sharply with elevated BMI."[31] Medina's BMI score is between 38 and 38.9, classifying him as obese.[32]

---

[26] "People with Certain Medical Conditions," Centers for Disease Control and Prevention (Mar. 29, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[27] "Obesity, Race/Ethnicity, and COVID-19," Centers for Disease Control and Prevention (Mar. 22, 2021), https://www.cdc.gov/obesity/data/obesity-and-covid-19.html.

[28] *Id*.

[29] *Id*.

[30] "People with Certain Medical Conditions," *supra* note 26.

[31] *Id*.

[32] Def.'s Mot. to Red. Sent. Ex. A.

3. <u>Risk of COVID-19 infection in prison</u>

In the United States, roughly 2.1 million adults are incarcerated.[33] The CDC has recognized the particular vulnerability of incarcerated persons to COVID-19 infection in its "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities." According to the CDC, correctional and detention facilities present "unique challenges for control of SARS-CoV-2 transmission among [inmates], staff, and visitors."[34] Incarcerated people live, work, eat, study and participate in activities in congregate environments, with few options for social distancing due to crowded conditions.[35] Daily staff movements, transfers of people between facilities and systems, and visits from outsiders such as family or legal representatives create many opportunities to introduce COVID-19 to a facility.[36] The high turnover rate at correctional and detention facilities, as well as residents often coming from a variety of geographic locations, adds to the risk.[37] *See also Raia*, 954 F.3d at 596 (noting that COVID-19 is "a highly contagious respiratory virus which . . . exposes unique risks in population-dense prison facilities") (citations omitted).

---

[33] Laura Maruschak and Todd Minton, "Correctional Populations in the United States, 2017-2018," Office of Justice Programs: Bureau of Justice Statistics at 1-2 (August 2020), https://www.bjs.gov/content/pub/pdf/cpus1718.pdf.

[34] "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," Centers for Disease Control and Prevention (July 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[35] *Id*.

[36] *Id*.

[37] *Id*.

These risks are real. As of June 16, 2020, the five largest known clusters of COVID-19 in the United States grew inside correctional facilities.[38] In May, the number of confirmed cases among prisoners doubled and deaths increased by 73 percent.[39] One in seven tests conducted on prisoners was positive.[40] The majority of infected people in prison are asymptomatic, but can still transmit the virus to more vulnerable people.[41] Since the outbreak began, 233 people in federal custody and 4 BOP staff members have died from COVID-19.[42] Over 46,800 prisoners and 6,840 staff have tested positive.[43] There are confirmed active cases at 93 BOP facilities.[44] It is reported that incarcerated persons are being infected at a rate more than 6.5 times higher than in the United States.[45] To address the rapid spread of COVID-19 in federal prisons, Congress passed the CARES Act authorizing the Attorney General to expand the use of home confinement to protect vulnerable prisoners from COVID-19 infection.[46] Despite this legislative

---

[38] Timothy Williams, *et al.*, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide* (June 16, 2020), https://www.nytimes.com/2020/06/16/us/coronavirusinmates-prisons-jails.html.

[39] *Id*.

[40] *Id*.

[41] *Id*.

[42] "COVID-19 Coronavirus" (updated daily), Federal Bureau of Prisons, https://bit.ly/2SOsQpe.

[43] *Id*.

[44] *Id*.

[45] "Defender Community Urges Legislative Action to Address COVID-19 Humanitarian Crisis in Federal Prisons," Federal Defender Services Office, Training Division (May 11, 2020) https://www.fd.org/news/defender-community-urges-legislative-action-address-covid-19-humanitarian-crisis-federal; "BOP-Reported Positive Tests for COVID-19 Nationwide," Federal Defenders of New York (2020), https://federaldefendersny.org/assets/uploads/BOP_Numbers.4.20.pdf.

[46] *Coronavirus Aid, Relief, and Economic Security Act*, H.R. 748 § 6002 at Div. B, Tit. II, Sec. 12003(b)(2)(2020) ("CARES Act").

expansion, the BOP has transferred less than 5 percent of the individuals in its custody to home confinement.[47]

Medina is incarcerated at USP Lewisburg, a facility with at least two confirmed active cases of COVID-19 among inmates.[48] Since the pandemic began, 244 inmates and 80 staff have contracted the virus and recovered.[49] Only 196 inmates out of the total inmate population of 911 have been vaccinated.[50]

Many facilities, such as USP Lewisburg, report few or no cases of COVID-19. These numbers do not tell the whole story. Testing at federal facilities has varied widely.[51] Without more information on how much testing is conducted at a particular facility, "it is possible that undetected cases are present" in these facilities, especially if the virus is spreading in the state where the facility is located. *See United States v. Asaro*, No. 17-127, 2020 WL 1899221, at *3 (E.D.N.Y. Apr. 17, 2020). *See also United States v. Croft*, No. 95-496, 2020 WL 3871313, at *2 (E.D. Pa. July 9, 2020) ("[W]e note that FCI Schuylkill has reported just one case of COVID-19 inside its facilities . . . . However, as the Government admits, FCI Schuylkill has not implemented widespread testing for the virus, so we cannot be certain of the true spread of infection at the prison."); *United States v. Jones*, No. 13-577-2, 2020 WL 3892960, at *5 (E.D. Pa. July 9, 2020) ("Without mass

---

[47] *See* "COVID-19 Coronavirus," *supra* note 42.

[48] *Id*.

[49] *Id*.

[50] *Id*.; "USP Lewisburg," Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/lew/.

[51] Luke Barr, "Questions remain about COVID testing at federal prisons as 2nd wave hits US," ABC News (Dec. 12, 2020), https://abcnews.go.com/Health/questions-remain-covid-testing-federal-prisons-2nd-wave/story?id=74680192.

testing – and any detailed information about the current conditions at FCI McKean – the Court may be getting a false picture. If the Court waits to act until the BOP confirms its first case of COVID-19 at FCI McKean, it may be too late for vulnerable inmates like Mr. Jones. The Court should not take that risk."); *United States v. Pabon*, No. 17-165, 2020 WL 2112265, at *4 (E.D. Pa. May 4, 2020) ("Correctional facilities that have made the decision to undertake mass testing have discovered dramatically higher numbers of infected inmates than previously imagined.") (citations omitted).

We find that the combination of these circumstances rises to the level of "extraordinary and compelling." Medina suffers from a serious medical condition associated with increased risk for COVID-19. He is housed at a facility where 246 inmates have contracted the virus. He is at continual risk for infection due to USP Lewisburg's congregate living environment, which could prove fatal.

*Danger to the Community*

Not every defendant who presents a qualifying extraordinary and compelling reason is entitled to relief under Section 3582(c)(1)(A). The Section 3553(a) factors may militate against a sentence reduction. Likewise, a Section 3142(g) finding that the defendant may present "a danger to any other person or to the community" precludes a sentence reduction. U.S.S.G. § 1B1.13(2).

Before granting a motion for compassionate release based on an extraordinary and compelling reason, a court must find that the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id*. § 1B1.13(2). The applicable Section 3142(g) factors include "the nature and circumstances of the offense charged," "the history and characteristics of the person," including "the

16

person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

The government argues that Medina presents a danger to the community due to the nature and severity of his drug and firearm offenses.[52] It points out that Medina is only 30 years old and he committed these offenses at age 25, making recidivism more likely.[53]

Medina admitted his conduct and pled guilty.[54] He has demonstrated remorse.[55] He has no prior criminal history. He has not been disciplined for any misconduct while in prison. He is not violent. Thus, we find that Medina does not present a danger to others or the community.

*Section 3553(a) Factors*

Section 3582(c)(1)(A) requires a court to consider whether a sentence reduction is warranted under the factors detailed in 18 U.S.C. § 3553(a) before granting a sentence reduction. Section 3553(a) instructs district courts to "impose a sentence 'sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)). Similar to the Section 3142(g) factors, the applicable Section 3553(a) factors include: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the need

---

[52] Govt. Resp. at 15.

[53] *Id*. at 15-16.

[54] Def.'s Mot. to Red. Sent. at 4; Govt. Resp. at 4.

[55] Def.'s Req. for Home Confinement or Comp. Release (ECF No. 47).

for the sentence to reflect the seriousness of the offense, promote respect for the law, provide punishment, deter criminal conduct and protect the public from further crimes by the defendant; (3) the kinds of sentences and sentencing ranges available; and (4) the need to avoid unwarranted sentence disparities among defendants committing similar offenses. 18 U.S.C. § 3553(a).[56]

Medina has served almost 67 months. With nine months' good conduct credit, his release date is scheduled for June 16, 2022.[57] He will serve ten years of supervised release under stringent conditions. As a convicted felon, he will face numerous collateral consequences in his life after release.[58] Thus, a reduced prison sentence will provide punishment and deter future criminal conduct, and will not diminish the seriousness of his offense and respect for the law.

Medina has taken advantage of the various courses and programs available in prison, including obtaining his GED and completing the BOP's Residential Drug Abuse Program (RDAP).[59] Upon release, he will live with his mother in Philadelphia.[60] His mother is disabled, and he can help care for her.[61] These factors weigh in favor of a sentence reduction.

---

[56] Because Section 3553(a) establishes factors for courts to consider when initially imposing a sentence, not every factor listed applies to the compassionate release context. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 406 (E.D. Pa. 2020).

[57] "Find an inmate," Federal Bureau of Prisons, https://www.bop.gov/inmateloc/.

[58] Collateral Consequences of Conviction Project, American Bar Association, https://www.americanbar.org/groups/criminal_justice/niccc/ (cataloging "over 45,000 federal and state statutes and regulations that impose collateral consequences on persons convicted of crimes").

[59] Def.'s Mot. to Red. Sent. at 17, Ex. B.

[60] *Id*. at 19.
[61] *Id*.

*Rehabilitation*

What has happened since a defendant was sentenced is relevant. It presents the most up-to-date information and amplifies or supplements the history and characteristics of the defendant. It informs the assessment of whether the defendant is deserving of any or no reduction in his sentence, and whether he is a danger to the community. It also provides insight into whether the defendant has been rehabilitated – an insight the sentencing court did not have. Indeed, evidence of post-sentencing rehabilitation is "highly relevant" to the Section 3553(a) factors. *Pepper v. United States*, 562 U.S. 476, 491 (2011). Hence, even though rehabilitation alone is not a ground for release or a sentence reduction under Section 3582(c)(1)(A), *see* 28 U.S.C. § 994(t), it is a relevant factor bearing on the analysis.

During his more than five years in prison, Medina's conduct and amenability to rehabilitation have been revealed to prison authorities. Ironically, on consideration of a motion under Section 3582, a court is in a better position to assess Medina's potential for rehabilitation than the sentencing court was. Thus, we shall consider Medina's rehabilitation together with other factors in the extraordinary and compelling analysis, the danger to the community assessment, and the Section 3553(a) factors.

Medina has shown that he is committed to his rehabilitation. While incarcerated, he completed many educational and training courses on topics such as Spanish, personal finance, drug education and commercial driving, and he obtained his GED.[62] Though he struggled with substance abuse issues before his incarceration, he has dedicated himself

---

[62] *Id.* at 17, Ex. B.

to achieving and maintaining sobriety in prison.[63] He has completed RDAP, which the BOP describes as its "most intensive treatment program."[64] As the government concedes, Medina chose to complete the 500-hour, nine-to-twelve month program despite the fact that he was ineligible to receive the one-year sentence reduction afforded to other participants.[65] He has had no disciplinary infractions in prison. His exemplary rehabilitation and conduct in prison support a sentence reduction.

## Conclusion

We find that the combination of the COVID-19 pandemic, Medina's compromised health, the risk of COVID-19 infection at USP Lewisburg, and the close proximity of his release date constitute extraordinary and compelling reasons to grant a sentence reduction. Medina's obesity places him at grave risk of severe illness or death if he continues to serve his sentence at USP Lewisburg. Medina is not a danger to the community, and the Section 3553(a) factors support compassionate release. Therefore, we shall grant Medina's motion for a sentence reduction.

---

[63] *Id*. at 14.

[64] "Substance Abuse Treatment," Federal Bureau of Prisons, https://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp.

[65] Govt. Resp. at 5.